NOT DESIGNATED FOR PUBLICATION

No. 122,256

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STUART E. WELLS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Marion District Court; MICHAEL F. POWERS, judge. Opinion filed August 27, 2021.
Affirmed.

*Stuart E. Wells*, appellant pro se.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., HILL and CLINE, JJ.

PER CURIAM: Stuart E. Wells seeks reversal of a bench trial verdict finding him guilty of speeding. He asserts several issues on appeal, which all stem from his allegations that the prosecutor did not provide him with the notes the officer made on the traffic citation before trial began and the trial transcript was missing a statement he alleges the officer made during the bench trial. We are unpersuaded by Wells' arguments and affirm the verdict.

1

FACTS

On June 15, 2019, Officer Kenneth Baldwin issued a citation to Wells for traveling 80 miles per hour in an area where the legal speed limit was 65 miles per hour. Both Officer Baldwin and Wells testified at the bench trial in Marion County District Court on Well's traffic citation. A court reporter was not present to transcribe the proceedings. Instead, the bench trial was electronically recorded. Wells represented himself.

Officer Baldwin testified that, using radar, he checked the speed of Wells' vehicle at 80 miles an hour in an area where the legal speed limit was 65 miles per hour. His dash cam video was admitted at trial. The video showed Officer Baldwin informed Wells twice that he had checked Wells' speed at 80. Wells denied traveling 80 miles per hour, to which Officer Baldwin responded, "It's locked on my radar, sir."

Officer Baldwin also testified about the various tests he performs on the radar before each shift to ensure it is working properly, including an internal circuit check, a speedometer test, and a tuning-fork test. He testified he performed all these tests before his shift on the day he issued the traffic citation to Wells. When asked if he performs any other types of radar tests after he makes a stop for a speeding violation, he testified that "[w]e do the internal circuit test after we write a citation. We just punch a button, and it goes through [its] internal test, pass and pass and it's good."

During Wells' cross-examination of Officer Baldwin, it was discovered there were different versions of Wells' traffic citation, one of which was an e-citation Wells had not seen before trial. The e-citation contained Officer Baldwin's notes in a box for "Court Comments," which read, "RUDE" and "RADAR DID PASS INT TEST." The district court read those notes out loud to the parties.

Wells also asked Officer Baldwin about other notations on his traffic citation. Officer Baldwin had marked a box signifying that he used "[l]idar" to detect Wells' speed but did not mark the box signifying that he used "[r]adar" to detect his speed. Officer Baldwin testified he made a mistake in marking the box for lidar, since he used radar, not lidar, to measure Wells' speed.

On recross-examination, Wells asked Officer Baldwin what the notation, "rude," meant. Officer Baldwin explained, "When I walked up, . . . to give you the citation, you just said, you weren't going that fast, and we'd see you in court."

After the district court found Wells guilty, Wells ordered a transcript of the bench trial. Although the record is not entirely clear, Wells apparently alleged the court reporter erred in transcribing the audio recording of the trial. The district court held two hearings to address Wells' claims.

At the first hearing, Wells claimed the transcript of the bench trial was "replete with a lot of dash, dashes, a lot of inaudibles," stating, "I estimate, roughly, 20 percent of it is inaudible, or—or confusing." When the district court judge asked Wells how many errors there were that Wells believed to be relevant, Wells stated that there were probably three to six. Wells then expressed that he still had a concern because he "found over 400, when [he] went through it, that were error instances where there's confusion, or—or inaudible." Wells explained what he meant by "there's confusion":

> "[T]here's a use of a double dash, and I don't understand the use of a double dash, with regard to the certain things, because it seems that the recorder used it to fill in the blank, on certain spots, where she used it to—where he or she used it to complete a statement, or to complete a word, or to complete a thought, to complete a sentence."

The district court directed Wells to notify the prosecutor of the three to six errors which he claimed were relevant and scheduled a second hearing where the court clerk could replay those portions of the audio recordings for Wells and the prosecutor. The court said if, after listening to the audio, the parties could not agree what was said, the court would join the parties for a replay to determine what was said. Wells did not object to this procedure.

At the next hearing, the district court began by addressing Wells' list of transcript errors:

> "Now, having looked back at the transcript, and your list, the vast majority of what you identified were simply two dashes, or two hyphens, which, generally, equates to a pause in the speaker. . . . I've seen many, many transcripts, and seeing that noted, within the transcript. I've never seen, or had an instance in which that represented a mistake. It was merely a way of showing a pause, or someone, perhaps we all go, ah, or whatever."

Wells noted he had been looking for a statement which he believed Officer Baldwin made at trial, which he could not find. He asked if the district court could recall Officer Baldwin for further questioning, which the court declined to do. Wells claimed Officer Baldwin testified that he "had no evidence of a crime, when he pulled Mr. Wells over." The prosecutor denied Officer Baldwin made this statement at trial.

The district court asked Wells to provide some point of reference as to when he claims Officer Baldwin made the alleged missing statement, so the court could direct the court reporter's attention to that portion of the trial. Wells could not direct the court to any such portion and, instead, asked that the court reporter listen to the entire trial recording again. The court declined to make such an order, noting that if Wells could not himself find the missing statement, then others would not likely be able to locate it.

4

On appeal, Wells argues the prosecutor's failure to disclose Officer Baldwin's notes violated *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and criminal discovery rules, justifying dismissal of the charges. He also argues his due process rights were violated because the record was incomplete and, most importantly, missing Officer Baldwin's alleged testimony that he had no reason to pull Wells over. We find no grounds to reverse Wells' conviction.

*Wells has not established a* Brady *violation*

Wells first asserts the prosecutor's failure to disclose Officer Baldwin's notes on the e-citation violated *Brady*, which requires prosecutors to turn over exculpatory evidence to a defendant in a criminal prosecution. The State points out Wells asserts this claim for the first time on appeal, and he invokes no exception which would allow us to consider his argument. Generally, constitutional claims cannot be raised for the first time on appeal. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Although there are exceptions to this general rule, the party seeking to raise the issue for the first time on appeal must invoke the exception. 301 Kan. at 1043; see Kansas Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 36) ("If the issue was not raised below, there must be an explanation why the issue is properly before the court.").

Wells asserts in his reply brief that he raised this issue because he "has complained about a lack of discovery throughout his case." He also claims he filed a "'Motion for Sanctions for Discovery Violation,'" which he admits is not in the record on appeal.

Without a copy of Wells' alleged motion, we cannot determine whether he raised a *Brady* violation below. While the record does contain a copy of Wells' pretrial "Motion to Sanction Failure to Provide Discovery," Wells withdrew this motion at the beginning of

the bench trial. Also, since Wells only learned of the notes during the bench trial, his pretrial motion could not have served as a vehicle to raise his *Brady* claim. Wells has the burden to designate a record sufficient to present his points on appeal and establish his claims. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013). He has failed to do so.

We could choose to deny Wells' claim of a *Brady* violation for his failure to properly raise it. See *State v. Anderson*, No. 114,447, 2016 WL 3961436, at *3 (Kan. App. 2016) (unpublished opinion). But Wells' argument also fails substantively since he cannot establish a *Brady* violation occurred.

Under *Brady*, 373 U.S. at 87, "'prosecutors have a positive duty to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *State v. Hirsh*, 310 Kan. 321, 334, 446 P.3d 472 (2019). The three essential elements of a *Brady* violation claim are: "(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice." *Hirsh*, 310 Kan. at 334.

Officer Baldwin made the notes, "RUDE" and "RADAR DID PASS INT TEST," on the e-citation. Wells does not allege these notes were exculpatory. Instead, he argues he could have used the notes to both (1) impeach Officer Baldwin and (2) confirm Officer Baldwin's poor demeanor on the day of the stop, which would allow him to develop better ideas for his defense. Even if we assume the notes could constitute impeachment evidence, Wells cannot satisfy the remaining prongs of the *Brady* test.

Wells discovered the notes during his cross-examination of Officer Baldwin, making it a late disclosure rather than an absent disclosure. The determination of whether a delayed disclosure of exculpatory information qualifies as a *Brady* violation depends on whether the defendant can establish prejudice based on the inability to use the *Brady* material effectively at trial. See *Hirsh*, 310 Kan. at 336; see also *State v. Breitenbach*, 313 Kan. 73, 98-99, 483 P.3d 448 (2021) (applying *Hirsh* principle and finding State did not "suppress" evidence when defendant received evidence during trial and, despite having opportunity to use evidence, did not). The late disclosure of the note "RUDE" did not prejudice Wells, since Wells asked Officer Baldwin what he meant by it. Likewise, the late disclosure of the note "RADAR DID PASS INT TEST" did not prejudice Wells because, like in *Breitenbach*, Wells had a chance to use it but did not. Wells was cross-examining Officer Baldwin when both notes were discovered and disclosed, so Wells could have asked the officer what he meant by this comment as well.

To prevail on his *Brady* claim, Wells also must show the notes were material to his case, and thus their suppression prejudiced him. See *Hirsh*, 310 Kan. at 334. Evidence is material only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense—a reasonable probability being interpreted as a probability sufficient to undermine confidence in the outcome. 310 Kan. at 334.

First, Wells cross-examined Officer Baldwin about what he meant by his "RUDE" note. Since the district court heard this alleged impeachment evidence, Wells cannot establish the outcome of his trial would have been different had the evidence been disclosed. Similarly, we are unpersuaded that pretrial disclosure of the note "RADAR DID PASS INT TEST" would have had any impact on the trial. While Wells complains on appeal that no one asked Officer Baldwin what this note meant, he overlooks his own opportunity to do so. Wells' failure to ask about this note after its disclosure evidences even he did not believe this note to be material. Further, Officer Baldwin's testimony

about his procedures for testing the radar, which include an internal circuit check, provides a reasonable inference as to the meaning of this note. Much like in *Breitenbach*, the delay in Wells' receipt of this note does not undermine our confidence in the outcome of the trial. See 313 Kan. at 97.

Officer Baldwin's notes were not suppressed; their disclosure was just delayed. Wells had (and exercised) the opportunity to explore the notes at trial. Because the late disclosure of the notes did not prejudice Wells' ability to use them effectively at trial, he cannot establish a *Brady* violation. See *Breitenbach*, 313 Kan. at 97.

*Wells failed to request the discovery sanction he now seeks*

Wells next alleges the district court erred by failing to sanction the prosecutor for not disclosing Officer Baldwin's notes before trial. Yet, Wells never requested such a sanction. As noted above, the only motion for sanctions in the record is his pretrial motion, which he filed before he learned of the existence of the notes and then withdrew at the beginning of trial.

Kansas' rules of criminal procedure include a provision governing discovery:

> "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this section or with an order issued pursuant to this section, the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances." K.S.A. 2020 Supp. 22-3212(i).

We have interpreted this provision to mean: "When the State fails to disclose evidence favorable to the defendant, the district court may impose a range of sanctions, including granting continuances, restricting the use of evidence, and entering any other order the

court 'deems just under the circumstances.'" *State v. Auman*, 57 Kan. App. 2d 439, 444, 455 P.3d 805 (2019). That said, we cannot fault a refusal to impose sanctions under K.S.A. 2020 Supp. 22-3212 unless a party asked for such sanctions. See *State v. Villa & Villa*, 221 Kan. 653, 657, 561 P.2d 428 (1977) ("Error cannot be predicated on the refusal of a trial court to exclude from evidence materials which the prosecution may have failed to disclose under K.S.A. 22-3212 unless the record on appeal discloses that the matter complained of was brought to the attention of the trial court for a ruling and for determination of an appropriate sanction under that statute."). Further, K.S.A. 60-404 prohibits reversal of the district court's verdict based on the erroneous admission of evidence without a timely and specific objection.

Although Wells informed the district court during the bench trial that he never received Officer Baldwin's notes, he never objected to their admission or alleged the State violated K.S.A. 2020 Supp. 22-3212. Because Wells never requested imposition of a sanction or exclusion of this evidence, we have no ruling from the district court on such a request to review. While he claims in his brief he asked for a sanction, he does not provide any record citation to support his claim. Without such a record, we presume the action of the district court was proper. See *In re Adoption of T.M.M.H.*, No. 115,309, 2016 WL 7032112, at *6 (Kan. App. 2016) (unpublished opinion), *aff'd* 307 Kan. 902, 416 P.3d 999 (2018).

*Wells was not denied due process because of an incomplete record*

Wells claims his due process rights were violated because he says the transcript of the bench trial contains errors and omissions. Wells seeks dismissal or remand for a new trial with directions that a court reporter take the record.

Whether due process has been afforded presents a question of law over which this court has unlimited review. *Washington v. Roberts*, 37 Kan. App. 2d 237, 240, 152 P.3d

9

660 (2007); see *Rodriguez v. State*, No. 118,717, 2018 WL 6426240, at \*3 (Kan. App. 2018) (unpublished opinion) (applying unlimited review to appellant's claim that district court violated his due process rights by failing to record hearing).

In criminal prosecutions, "due process requires a reasonably accurate and complete record of the trial proceeding in order to allow meaningful and effective appellate review." *State v. Holt*, 298 Kan. 531, 537, 314 P.3d 870 (2013). Because material error in the trial transcript substantially hinders effective appellate review, this substantive due process right also includes the right to a reasonably accurate transcript. 298 Kan. at 537-38. "When legitimate claims that have a substantial foundation based on the available record are not susceptible to appellate review because the transcript is manifestly incomplete or inaccurate, the proper remedy is to reverse and remand for a new trial." 298 Kan. at 538.

Even so, "[a] defendant does not have a constitutionally protected right to a totally accurate transcript of the criminal proceedings." 298 Kan. at 538. An incomplete record does not require reversal if it involves no substantial or significant omissions. An appellant seeking reversal because he or she was denied due process based on an inaccurate or incomplete transcript "must make the best feasible showing possible that a complete and accurate transcript might have changed the outcome of the appeal." 298 Kan. at 538.

Wells bases his argument on two assertions, neither of which appears true. First, he claims "it was determined that an estimated 20 percent or more of the record for appeal was either missing or wrong." Next, he reprises his claim that Officer Baldwin testified during the bench trial that he had no reason to pull Wells over, and that statement is now missing from the bench trial transcript.

As to his first assertion, once again, Wells provides no record citation for this alleged determination. Our review of the record reveals Wells is the one who made this assertion, not the district court. At the first posttrial hearing, Wells claimed the transcript of the bench trial was "replete with a lot of dash, dashes, a lot of inaudibles," stating, "I estimate, roughly, 20 percent of it is inaudible, or—or confusing." The district court explained the meaning of these notations at the second hearing, noting the "vast majority" of Wells' alleged errors were not errors, but simply represented pauses in testimony. Wells has failed to provide either a foundation for his claim of transcript error or explain how these alleged errors might have changed the outcome of the appeal.

Wells also failed to satisfy his burden as to the alleged missing statement from Officer Baldwin. First, Wells provides no credible basis to believe Officer Baldwin testified he had no reason to pull Wells over. For one, Officer Baldwin's dash cam video shows that when Officer Baldwin pulled Wells over, he twice told Wells that he checked Wells' speed at 80. Second, Officer Baldwin testified at trial he pulled Wells over for speeding.

Not only does Officer Baldwin's alleged missing statement directly conflict with the evidence from his dash cam video and his own testimony, Wells provided no record citation to either the district court or this court as to where he claims Officer Baldwin made the alleged statement. At the second posttrial hearing, the district court provided Wells a chance to provide this information, but Wells could not. Wells has provided no foundation, much less a substantial foundation, that the transcript is manifestly incomplete or inaccurate. We will not reverse the district court's verdict on this basis.

Wells also argues Officer Baldwin's alleged missing testimony created reasonable doubt sufficient to undermine the district court's verdict and demonstrated his Fourth Amendment rights under the United States Constitution were violated. Since Wells provided no credible basis or record support for his assertion that Officer Baldwin

testified he had no reason to pull Wells over, we are unpersuaded by these arguments as well.

Affirmed.